# IN THE SUPREME COURT OF IOWA

No. 21–1472

Submitted April 20, 2022—Filed June 3, 2022

**IN THE INTEREST OF K.D.** and **K.D.,** Minor Children.

**PAUL L. WHITE,** Guardian Ad Litem, and **C.H.**, Intervenor,

Appellants.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Lynn Poschner, District Associate Judge.

A guardian ad litem and intervenor seek further review of a court of appeals decision that affirmed the juvenile court's order maintaining the Iowa Department of Human Services as the children's guardian. **DECISION OF COURT OF APPEALS VACATED; JUVENILE COURT JUDGMENT REVERSED AND REMANDED.**

Christensen, C.J., delivered the opinion of the court, in which Appel, Waterman, and Oxley, JJ., joined. Mansfield, J., filed a dissenting opinion, in which McDonald and McDermott, JJ., joined. McDonald, J., filed a dissenting opinion, in which Mansfield and McDermott, JJ, joined.

Paul L. White of Des Moines Juvenile Public Defender, Des Moines, attorney and appellant guardian ad litem for the minor children.

Andrea M. Flanagan of Flanagan Law Group, PLLC, Des Moines, for appellant intervenor.

Thomas J. Miller, Attorney General, and Natalie A. Deerr, Assistant Attorney General, for appellee State.

3

**CHRISTENSEN, Chief Justice.**

Just as we authorize the removal of children from their parents' care when the parents fail to ensure their children's welfare, we must also remove the children's guardian when the guardian irresponsibly discharges its duties and acts contrary to the children's best interests. That is what occurred here when the Iowa Department of Human Services (DHS), acting as the children's guardian, entered the children's home of approximately eighteen months in the care of their stepgrandmother on the pretext of a visit and abruptly removed them from her care to place them in foster care with strangers. One of the children became so distraught that she vomited, and the other child started shaking.

DHS took these actions knowing the children's guardian ad litem (GAL) and attorney[1] had filed a notice seeking a hearing to address "unanswered questions and concerns" he had about DHS possibly moving the children despite warning from one of the children's therapists strongly discouraging additional placements and trauma. After the stepgrandmother informed the GAL of the children's removal the day after it occurred, the GAL filed motions for the immediate return of the children to their stepgrandmother, for a hearing on modification of placement, and to remove DHS as guardian. The juvenile court also allowed the stepgrandmother to intervene.

---

[1]In this case, the children's GAL and attorney are the same person. For brevity, we refer to him throughout this opinion as the GAL.

Following a hearing, the juvenile court concluded DHS acted unreasonably in failing to provide written notice to the children's relatives as required under Iowa Code section 232.84 (2021) but not in moving the children to foster care. Thus, it declined to remove DHS as the children's guardian. The GAL and stepgrandmother appealed, challenging the juvenile court's decision not to remove DHS as guardian. A divided court of appeals agreed DHS acted unreasonably in failing to provide written notice to the children's relatives and in removing the children from their stepgrandmother in the manner that it did, but a majority reasoned DHS was looking out for the children's best interests and declined to remove DHS as the children's guardian. We granted the GAL and stepgrandmother's applications for further review.

On further review, we conclude DHS acted unreasonably in (1) failing to send relative notices and (2) in failing to serve the children's best interests by taking such drastic measures to remove the children from their stepgrandmother's care without warning only to place them in a foster home with no assurance of permanency in that home. Although DHS raised some concerns regarding the stepgrandmother's care, DHS did little to address these concerns and failed to "make every effort to establish a stable placement for the child[ren]." Iowa Code § 232.117(6). Therefore, we vacate the decision of the court of appeals, reverse the juvenile court's order, and remand to the juvenile court with directions to remove DHS as the children's guardian and determine an appropriate guardian.

**I. Background Facts and Proceedings.**

The children in this case, K.T.D. and K.J.D., have been involved with DHS for much of their young lives, beginning with the removal from their parents at ages two and three years old in March of 2018. A juvenile court subsequently adjudicated the children as children in need of assistance (CINA) due to their parents' substance abuse and failure to provide adequate supervision. During this CINA period, the children were initially placed with their paternal grandmother but had to move to foster care after roughly one month with the paternal grandmother because she was dishonest with DHS about who was living in her home. That CINA case closed through a bridge order giving Dad custody in late 2019, but this closure was short-lived because of the parents' domestic violence and continued substance abuse.

On January 23, 2020, the children went to live with their paternal stepgrandmother,[2] and the juvenile court officially authorized their removal from their parents on February 6. The children remained in the stepgrandmother's care for approximately eighteen months, as they lived with her throughout this second CINA case and after the juvenile court terminated the parents' rights on April 14, 2021. DHS's termination of parental rights (TPR) report notes DHS did not send relative notices or have anyone fill out relative worksheets in the case after the children were removed from their parents' custody because "[t]he

---

[2]The paternal stepgrandmother was the partner of the children's paternal grandfather for around twenty years until he passed away shortly before the children were placed in her care. The stepgrandmother was not a placement option during the first CINA case because her partner, the children's grandfather, was battling cancer and admittedly used marijuana to build his appetite during that time.

relative worksheets are filled out only when children are sent to foster care. In this situation they were placed with a relative/suitable other which did not require notices to be sent out." That placement was the stepgrandmother.

In the juvenile court's termination order, it concluded, "DHS is in the best position to act as guardian and to consider and select the children's adoptive home" and transferred guardianship and custody of the children to DHS. After the juvenile court terminated the parents' rights, and with DHS's knowledge and consent, the stepgrandmother started adoption classes through Four Oaks with the belief that she was a candidate to adopt the children. The children's attorney and GAL, Paul White, has been their attorney and GAL for both the 2018 CINA case and throughout these proceedings and was under the same impression regarding the stepgrandmother's adoption of the children.

Due to their history, K.T.D. and K.J.D. both struggle with mental health issues. K.T.D.'s therapist reported K.T.D. "continues to meet criteria for Unspecified Trauma and Stressor Related Disorder due to the trauma that she has experienced and symptoms including avoidance, hypervigilance, nightmares, and intrusion." Similarly, K.J.D.'s therapist reported K.J.D. "continues to meet criteria for Unspecified Trauma and Stressor Related Disorder related to experiencing significant trauma and symptoms including avoidance, nightmares, hypervigilance, problems with concentration, and re-enactment of experienced trauma." K.T.D. demonstrated an Adverse Childhood Experience Score (ACES) of 6 out of 10, and K.J.D. demonstrated an ACES of 9 out of 10. As one of the children's therapists noted, "Adverse childhood experiences impact

the development of a child and can increase the likelihood of lifelong mental or physical health problems." Because of the children's history, their therapists "strongly discouraged" additional placements and transitions and stressed the importance of consistency in their lives.

On June 9, the GAL filed a notice to the juvenile court regarding the possible modification of the children's placement because he received an email indicating DHS "intended to move these Children from the current relative placement to foster care." White explained that he had

> unanswered questions and concerns about the need to modify the placement of these Children. The DHS has not stated an imminent risk of harm or safety to these Children. Further, the undersigned seeks current input from the Children's therapist regarding modification. The modification of placement from a relative to a foster care placement is a more restrictive placement. Because relative placement is mandated over foster care placement, the undersigned requests that prior to any modification, this matter be scheduled for hearing before this Court.

A June 10 DHS report discussed two possible adoptive placements for the children: the stepgrandmother or foster parents who had assisted the family in the past and had custody of the children's older half brother. However, those foster parents withdrew their interest in adopting the children for reasons not stated in the record sometime shortly after DHS wrote that June report.

The June report noted a few concerns about the children's placement with the stepgrandmother. The primary concern was the children's inconsistent attendance at therapy, as K.J.D. missed eleven of twenty-four scheduled sessions and K.T.D. missed ten of twenty-six scheduled sessions. In January 2021, K.T.D.'s therapist documented some missed appointments, though she

wrote, "The missed appointments have often been due to other scheduling needs for [K.J.D.], her sibling, or for [the stepgrandmother.]" The stepgrandmother had a total ankle replacement around late December 2020 or early January 2021 that became infected and affected her mobility, though she has since participated in therapy to rehabilitate the ankle.

Another concern that DHS had in its June 2021 report included the stepgrandmother's possible coaching of the children to tell their therapists that they did not like the foster parents, who at the time were considered another adoptive placement for the children, and the stepgrandmother's disparaging of those foster parents. Further, DHS expressed concern that the stepgrandmother was allowing the children to spend time around her daughter-in-law, who had pending child endangerment and drug charges and a no-contact order with her own children.

A concern that DHS listed in the March TPR report was that K.J.D. was not enrolled in school despite being kindergarten-aged and K.T.D. was not in daycare. The report notes the stepgrandmother did not feel comfortable sending them due to COVID-19 concerns and she also wanted to give K.J.D. a chance to establish stability and catch up academically with help from the stepgrandmother before enrolling her. Although the kindergarten-daycare issue was listed as a concern by DHS in the March TPR report, and cited by the juvenile court in its order, it was not included as a concern by DHS in its next report filed in June. The June report also observed that the children would likely get to see their father and extended paternal relatives if they remained with their

stepgrandmother, but they likely would not have contact with their mother or half-siblings. Nevertheless, the DHS report noted K.T.D's therapist's belief that "the current long-term plan [with the stepgrandmother] is not in the children's best interest and would result in them being placed in a home where they have less of a chance of having any relationship with their parents/extended family."[3]

The juvenile court never scheduled a hearing in response to the GAL's June 9 notice requesting a hearing prior to placement modification based on his concerns that DHS might try to move the children to foster care. Instead, it conducted a "permanency review by paper filing only," which simply noted the GAL's concern in a review order filed on June 11. In that order, the juvenile court found, "The children's needs are being met. They are currently residing with [their stepgrandmother], suitable other placement."

The only concern from DHS that the juvenile court noted in this order was the concern from the children's therapist discussed in the June 10 DHS report about the stepgrandmother's possible coaching of the children about what to say in therapy. The order noted DHS "also considers an alternate placement for the children," but it did not include any details that would lead the GAL or stepgrandmother to believe DHS would soon orchestrate a surprise removal of the children from the stepgrandmother's care. This is especially so considering

---

[3]It is unclear what information the therapist had about the children's ability to interact with their parents and extended family when she made this statement because the record shows the children had a significant amount of interaction with their paternal relatives in the stepgrandmother's care.

that other foster placement DHS was considering at the time fell through shortly after this hearing.

On July 26, Riley Hackman, the DHS social work case manager for the children's case, texted the stepgrandmother to inform her that she would be visiting the stepgrandmother's home with Amra Viso, a DHS adoption worker who had never met the stepgrandmother. Nobody from DHS contacted the GAL about the visit, and the stepgrandmother believed they were visiting to discuss her adoption of the children. Instead, Hackman and Viso arrived at the stepgrandmother's home for the meeting with the purpose of removing the children from the home and taking them to a foster home of strangers to the children without warning the stepgrandmother, the children, or the GAL. Hackman later explained that the DHS staff involved did not tell the stepgrandmother about the removal in advance because they were concerned "that [she] might make comments to the -- to the girls that would make this process a little bit more difficult." At the time of removal, the children had been in the stepgrandmother's care for just over eighteen months.

This surprise removal proved "extremely traumatic" for the children, as Viso acknowledged. Viso admitted that "[i]t was emotionally difficult for the children to separate from their grandma" and they "were very upset." K.J.D. vomited and K.T.D. was shaking. They both did not want to leave the stepgrandmother, but Viso explained the stepgrandmother handled the situation well by "prioritiz[ing] the children['s] well-being at that moment, and she was able to control her own feelings and escorted them out of the building, providing

positive [re]inforcement during that process." The GAL found out about the removal from the stepgrandmother after the removal had occurred.

The next day, the GAL contacted Hackman to inquire about the situation. Hackman informed Viso, and Viso emailed the GAL to indicate this removal was planned and DHS purposely did not tell the stepgrandmother that they were going to remove the children when they arranged the meeting with her. On July 29, the GAL filed a motion for the immediate return of the children to their stepgrandmother, for a hearing on modification of placement, and to remove DHS as guardian. The stepgrandmother also filed a motion to intervene, which the juvenile court granted.

The juvenile court conducted a hearing on the motions on September 1 and 9. Many of the children's relatives attended. Hackman, Viso, and the stepgrandmother all testified but the children's therapists did not. The only input from the therapists came in the form of letters documenting that the children were doing well in foster care about one month after they were removed from the stepgrandmother's home.

At the hearing, Hackman described various concerns that DHS had about the stepgrandmother's care for the children. These included concerns about the children's inconsistent therapy participation, the stepgrandmother's possible coaching of the children on what to say about their past foster parents, concerns about the stepgrandmother's "health interfering with some things[,] [t]ransportation[,] . . . [a]nd concerns regarding [the stepgrandmother] being dishonest about a no-contact order that was in place in December" between her

daughter-in-law and the daughter-in-law's children. Hackman stated that the daughter-in-law's children were with the stepgrandmother at some point in December and the stepgrandmother did not disclose them to Hackman. It is unclear from the testimony whether Hackman meant the daughter-in-law's children were staying in the stepgrandmother's home or the stepgrandmother was simply watching the children in a babysitting capacity. Nevertheless, when questioned about what evidence DHS had that the stepgrandmother was allowing "inappropriate people" around the children, Hackman conceded, "We have suspicions but no evidence."

When the GAL asked Hackman whether the children's therapists were informed of DHS's intent to remove the children prior to the July 26 removal, Hackman said they were informed. Upon further questioning from the GAL, Hackman backtracked this statement in the following exchange:

> [GAL:] Okay. So would it surprise you to know that I -- I've spoken with [K.J.D.'s] therapist, and she told me that they were not informed prior to July 26th?
>
> [Hackman:] That would surprise me, yes.
>
> [GAL:] Okay. So -- so if [K.J.D.'s] therapist, Erin, informed me that -- that they were not informed of the Department's action on July 26th, that would surprise you?
>
> [Hackman:] It's possible there was a misunderstanding, but I recall them being aware that this was something we were going to do.
>
> [GAL:] So the therapists, then, were informed that the Department was gonna take action -- that's your testimony, the Department was gonna take action on this July 26th meeting; is that your testimony?
>
> [Hackman:] Let me clarify, if I may.
>
> [GAL:] Certainly.

[Hackman:] My testimony is not that they knew, this day, this time this is what we were going to do. They knew we were considering placing them in the former foster home with the [past foster parents] and then elsewhere after the [past foster parents] were out of -- were withdrawing their interest, for lack of a better word.

In Viso's testimony, she claimed she worked with one of the children's therapists on the best way to remove the children and had documentation of her emails with the therapist. We found no such documentation of this communication in the record before us on appeal. Upon further questioning from the GAL, Viso conceded that she could not remember if she informed the children's therapists of the planned removal date in advance but someone from DHS did inform the therapists after the removal had occurred.

Viso explained her understanding of the situation was that DHS asked Four Oaks to discontinue adoption classes and the home study for the stepgrandmother. Viso was not sure anyone conveyed this to the stepgrandmother. When asked why the stepgrandmother was not the preferred choice to adopt the children, Viso discussed her belief that the stepgrandmother was sabotaging the plan for the children to go to the foster parents where their half brother was placed. Viso did not go into specifics and acknowledged she did not have any firsthand knowledge of this alleged sabotaging behavior. These foster parents were no longer a placement option for reasons not listed in the record by the time the children were removed from the stepgrandmother.

Viso indicated the health concern DHS had with the stepgrandmother included how the stepgrandmother's foot infection had affected her mobility, though the stepgrandmother is now back to being mobile. Despite concerns

about the stepgrandmother's ability to meet the children's mental health needs, Viso admitted upon questioning that she did not ask the children's current foster parents directly how familiar they were with the children's diagnoses and what kind of therapy the children would require before placing the children in their care. In the two months between the children's removal and the hearing, DHS had only facilitated a total of three sessions with one of the children's therapists despite expecting the stepgrandmother to assist with weekly sessions for the children.

Moreover, Viso testified that the children continue to have visits and a relationship with the stepgrandmother. Viso remarked,

> T[he children] are always sad to leave Grandmother after the visit, they would like to spend more time with Grandma, but it was very difficult first few visits, first two visits. They were crying a lot when Grandma was leaving, and then the last two visits, they are still sad, but you can see that they are focusing --they love Grandma, but they are focusing as well on what is going to happen at home when they come back.

She stated, "That grandma-grandchild relationship . . . that will be something I will always, as long as she follows the children's therapists' recommendations, I will always -- I will always say it's good for those children. But -- and will be beneficial for them." Nevertheless, Viso proclaimed, "The thing with adoption is once the children are adopted, I don't guarantee that these relationships will continue."

Viso testified:

> [The children] are thriving in that foster home, that they are building this trusting relationship with foster parents. I know that their family loves them, but it's the best interest of the children . . . to have that parent that's there for them 24/7. That they'll be

> responsible, that they'll take care of their needs, that they'll put some boundaries as a parent when needed. I think they are in [a] good place.

With that said, DHS had never placed any children with the foster parents before and had not discussed with the foster parents whether they are an adoptive home for the children at the time of the hearing.

The stepgrandmother admitted during her testimony that she sometimes fell short in making sure the children participated in therapy and did not always agree with the children's therapist. Regarding the concerns about her health, she explained she is mobile again and continues to participate in physical therapy. The stepgrandmother noted she received a lot of assistance from the children's paternal side of the family in caring for the children, so the children were frequently around their paternal grandmother and cousins.

The juvenile court issued its ruling denying the motions on September 29. It concluded that "DHS acted irresponsibly when it did not send statutorily required notices to relatives" and ordered DHS to do so, but it decided DHS "did not act irresponsibly or unreasonably as guardian in the ultimate decision that the children should not live with [the stepgrandmother.]" The juvenile court also determined it was not in the children's best interests to place them in the guardianship and custody of the stepgrandmother because she "has not shown that she is in the best position to act as the children's decision-maker or person

vested with meeting their permanency needs." Both the GAL and stepgrandmother appealed this order.[4]

In a split decision, the court of appeals concluded DHS acted unreasonably when it failed to send the statutorily required relative notices under section 232.84, but the juvenile court's order for DHS to make those notifications "was an appropriate remedy." It also determined DHS acted unreasonably in removing the children from the stepgrandmother's care, especially without warning or communicating its concerns in advance. Nevertheless, the court of appeals affirmed the juvenile court's ruling allowing DHS to remain as the children's guardian and custodian, proclaiming, "[T]he DHS was acting in the children's best interests by placing priority on the children's mental health and educational needs when searching for a permanent placement." A dissenting judge argued removal of DHS as guardian was in the children's best interests because DHS caused "profound" trauma when it "acted egregiously in entering the grandmother's home on the pretext of a visit and in snatching the children from the home."

The GAL and intervening stepgrandmother both filed applications for further review, which we granted. In granting further review, we also directed the parties to file supplemental briefs "on the issues raised on appeal and in the applications for further review."

---

[4]The GAL's petition on appeal and the stepgrandmother's supplemental brief include information outside of the record about actions that have occurred since the juvenile court's ruling, which the State maintains we cannot consider in reaching our decision. We agree with the State and do not consider that information on appeal.

**II. Standard of Review.**

Section 232.118 gives the juvenile court discretion in determining whether to remove a guardian. Iowa Code § 232.118(1) ("[T]he court having jurisdiction of the child may, after notice to the parties and a hearing, remove a court-appointed guardian and appoint a guardian in accordance with the provisions of section 232.117, subsection 3."). "[W]here the legislature has clearly vested the juvenile court with discretion in a specific area, we review the court's decision on that matter for an abuse of discretion." *State v. Tesch*, 704 N.W.2d 440, 447 (Iowa 2005). With that said, we continue to review the evidence de novo to determine whether the juvenile court abused that discretion. *Id.* An abuse of discretion occurs when the juvenile court "bases its decisions on grounds or reasons clearly untenable or to an extent that is clearly unreasonable . . . [or] if it bases its conclusions on an erroneous application of the law." *State v. Thoren*, 970 N.W.2d 611, 620 (Iowa 2022) (omission and alteration in original) (quoting *Stender v. Blessum*, 897 N.W.2d 491, 501 (Iowa 2017)).[5]

---

[5]This is different from the abuse of discretion cited in Justice McDonald's dissent, which ostensibly heightens the bar required to meet the abuse of discretion standard by claiming an abuse of discretion occurs when a decision is "so flawed and prejudicial to the administration of justice that this court must provide relief." (quoting *In re 2018 Grand Jury of Dallas Cnty.*, 939 N.W.2d 50, 66–67 (Iowa 2020) (McDonald, J., concurring in part and dissenting in part)). Under that standard, it is unclear if a juvenile court's decision based on an erroneous application of the law constitutes an abuse of discretion if that erroneous application is not so egregious that it is "prejudicial to the administration of justice."

Our court has never applied this standard. In fact, the only time this standard has ever been so much as described by anyone on our court was in a stand-alone opinion concurring in part and dissenting in part from Justice McDonald in 2020. *See In re 2018 Grand Jury of Dallas Cnty.*, 939 N.W.2d at 66–67. "Ultimately, there is a difference between reasoned deference to the opinions of professionals involved in the case and blind acceptance on substantive matters." *In re D.D.*, 955 N.W.2d 186, 197 (Iowa 2021) (Christensen, C.J., concurring specially). The juvenile court's conclusion in this case—and the dissents' approval of it—is more blind acceptance than

**III. Analysis.**

The GAL and intervening stepgrandmother argue the juvenile court should have removed DHS as the children's legal guardian and returned the children to their stepgrandmother's care. In terminating the parents' rights to the children, the juvenile court ordered the children to remain in the guardianship and custody of DHS under Iowa Code section 232.117(3)(*a*). Nevertheless, the juvenile court has the authority to remove an appointed guardian "[u]pon application of an interested party or upon the court's own motion" and appoint a new "guardian in accordance with the provisions of section 232.117, subsection 3." *Id.* § 232.118(1).

Section 232.118 offers "no preference to any person or entity." *In re N.V.*, 877 N.W.2d 146, 150 (Iowa Ct. App. 2016) (quoting *In re D.H.*, No. 10–1313, 2010 WL 4484849, at *4 (Iowa Ct. App. Nov. 10, 2010)). Nor does it provide any statutory criteria for courts to consider in deciding whether to remove a guardian. Although this is our first opportunity to examine an application to remove a court-appointed guardian under section 232.118, the court of appeals has dealt with this issue on various occasions and established the criteria we now adopt in analyzing the applicants' request to remove DHS as the children's guardian. *See, e.g., id.* at 150.

Specifically, two elements must exist to warrant removal: (1) the current guardian's actions were unreasonable or irresponsible; and (2) the current

---

reasoned deference in choosing to overlook DHS's multiple violations of internal procedures and statutory obligations as the children's guardian.

guardian's actions did not serve the children's best interests. *See, e.g., id.*; *In re E.G.*, 745 N.W.2d 741, 744 (Iowa Ct. App. 2007). Even when a guardian's actions are unreasonable, we will not remove the guardian unless doing so is in the children's best interests. *In re N.V.*, 877 N.W.2d at 150. We do not treat this request for the removal of DHS as guardian as a custody battle between DHS and the stepgrandmother. "Rather, in the context of this case, [we] must focus on the process DHS used and the actions it took in reaching the placement decision and then determine whether those were unreasonable (or irresponsibly undertaken)—all with the best interests of the child in mind." *In re J.L.*, 21–0968, 2022 WL 246170, at *9 (Iowa Ct. App. Jan. 27, 2022). The GAL and stepgrandmother, as the ones who moved for the removal of DHS as guardian, have the burden to prove DHS acted unreasonably by a preponderance of the evidence. *Id.*; *see also* Iowa R. App. P. 6.904(3)(*e*)–(*f*). "A preponderance of the evidence is the evidence 'that is more convincing than opposing evidence' or 'more likely true than not true.'" *Martinek v. Belmond–Klemme Cmty. Sch. Dist.*, 772 N.W.2d 758, 761 (Iowa 2009) (quoting *Holliday v. Rain & Hail L.L.C.*, 690 N.W.2d 59, 63–64 (Iowa 2004)).

There are two separate DHS actions at issue here in considering whether to remove DHS as the children's guardian. First, we must address the failure of DHS to send relative notices. Second, we must review DHS's actions in abruptly removing the children from the stepgrandmother's home to place them in a foster home with strangers without an adequate permanency plan in place to establish a stable placement for the children. To the extent the parties also argue the

juvenile court did not identify a substantial change in circumstances after the termination order to justify removing the children from the stepgrandmother's care, we need not address this issue because we are reversing the juvenile court's ruling on other grounds.

**A. Failure to Send Relative Notices.** The GAL and stepgrandmother contend DHS acted unreasonably by failing to send relative notices as required under Iowa Code section 232.84(2). This section provides,

> Within thirty days after the entry of an order under this chapter transferring custody of a child to an agency for placement, the agency shall exercise due diligence in identifying and providing notice to the child's grandparents, aunts, uncles, adult siblings, parents of the child's siblings, and adult relatives suggested by the child's parents, subject to exceptions due to the presence of family or domestic violence.

*Id.* The DHS worker in this case testified that she never sent relative notices because she only fills out relative worksheets when the children are sent to foster care in lieu of relative or suitable other placement. However, there is no statutory exception to the relative notice requirement. "[E]ven if the relatives were informally aware of the child[ren]'s transfer to foster care, the burden remained with the department to formally notify them of the transfer. The contents of the notice are statutorily prescribed and are specific and detailed." *In re N.V.*, 877 N.W.2d at 151.

On appeal, the State "does not dispute that [DHS] acted unreasonably when it failed to send relative notices," but it maintains that "removal of DHS as the guardian is not the appropriate remedy." We agree that this failure to send relative notices alone does not warrant the removal of DHS as the children's

guardian. *See, e.g.*, *In re I.P.*, 19–0715, 2019 WL 3317922, at \*3 (Iowa Ct. App. July 24, 2019) ("[A] case worker's failure to provide timely statutory notice to relatives is not a basis to remove the DHS as guardian."). The juvenile court's order for DHS to send belated relative notifications is an appropriate remedy for this statutory violation.

**B. Removal of the Children from Their Stepgrandmother's Home.** The GAL and stepgrandmother assert DHS acted unreasonably, and thus should be removed as the children's guardian, because it removed the children from the stepgrandmother without adequate transition planning. The stepgrandmother stresses DHS's failure to fulfill its "responsibilities flowing from Iowa Code § 232.117(6)–(9), which provide for ongoing post-termination court supervision," claiming DHS disregarded its duty "to diligently pursue and place children in their permanent home." The State maintains DHS acted reasonably in removing the children from the stepgrandmother's home based on its concerns about the stepgrandmother's ability to care for the children. Alternatively, even if we conclude DHS acted unreasonably, the State contends it is not in the children's best interests to remove DHS as the children's guardian.

Before we begin our analysis, we stress that our focus is on more than the act of DHS's removal of the children from their stepgrandmother. The removal itself is just one piece of the puzzle. Instead, we are examining the puzzle as a whole, also reviewing DHS's actions in reaching its removal decision and the steps DHS took to transition the children and establish a stable placement for them.

DHS's procedures and Iowa Code section 232.117(6) are especially relevant in determining whether DHS acted unreasonably in this case. DHS's own transition planning procedures provides, "The period for transferring a child's case responsibility from a [social work case manager] to an adoption worker is 45 days from electronic filing of the order for termination of parental rights." Iowa Dep't of Hum. Servs., *Employees' Manual: Adoption Permanent Placement Procedures* 10 (2022). The procedures also establish the joint responsibility of the social work case manager and adoption worker to "[c]omplete a joint visit with the child and child's placement provider within 45 days of termination of parental rights." *Id.* at 13. Yet, DHS did not transfer the case to the adoption worker, Viso, until the first or second week of July—well past forty-five days after the juvenile court filed the April 14, 2021 TPR order— and Viso testified that she had never met the stepgrandmother before she arrived to remove the children from her care. Further, the social work case manager incorrectly informed Viso that there were no other relatives available for placement when this assertion was unsupported because the case manager failed to send the statutorily-required relative notices that would have clarified DHS's placement options for the children. *See* Iowa Code § 232.84.

More importantly, DHS failed to meet its obligations under section 232.117(6). This section states, "[T]he guardian shall submit a case permanency plan to the court and shall make every effort to establish a stable placement for the child by adoption or other permanent placement." *Id.* § 232.117(6). There are

no exceptions to these statutory requirements that DHS failed to meet here through its poorly planned transition process.

DHS adoption worker Viso testified that she had no conversation with the receiving foster parents as to whether they wished to become the children's adoptive parents and DHS had never placed any child with these foster parents before. Further, despite DHS's concerns about the stepgrandmother's ability to consistently meet the children's mental health needs, Viso admitted in her testimony that she did not ask the new foster parents how familiar they were with the children's mental health diagnoses or the mental health therapy that the children required. DHS made these decisions without consulting the children's GAL, who had been involved with this family longer than the DHS social work case manager and adoption worker.

In the past, the court of appeals has approvingly cited DHS testimony explaining there is "research that shows children can be successfully transferred . . . and still show few or no long-term effects when it's done properly, slowly, and with the support of all of the adults in the child's life." *In re I.P.*, 2019 WL 3317922, at *3. That sort of transfer clearly did not happen here when DHS workers arrived at the stepgrandmother's home on the pretext of a seemingly routine visit only to surprise the stepgrandmother and children by removing the children from their home. This problematic approach is only compounded by the children's mental health issues that have led their therapists to caution against "[a]dditional placements and transitions . . . to prevent further trauma."

For example, in a report filed the month before termination, K.T.D.'s therapist wrote,

> Given [K.T.D.]'s trauma history, developmental stage, and her attachment needs[,] it is imperative that a plan be developed to provide [K.T.D.] with a long-term option for a safe and nurturing home. It will be important that this plan include a caregiver who understands [K.T.D.]'s physical, emotional, and developmental needs and can consistently provide for these needs. It is important that this caregiver be open to a therapeutic parenting approach and be open to working closely with this therapist regarding the impact of developmental trauma on [K.T.D.] in order to establish and maintain parenting approaches that will be trauma informed and meet her developmental needs.

Given the therapists' recommendations, we struggle to see how it was in the children's best interests to abruptly remove the children from their long-term home only to place them in a home with strangers who DHS had not so much as asked about their familiarity with the children's mental health diagnoses or therapy requirements. The evidence is conflicting about the extent to which DHS even communicated with the children's therapists about the removal plan before abruptly removing the children, as Hackman testified that the therapists were aware that DHS was considering moving the children to another placement while Viso claimed she worked with one of the children's therapists on the removal plan. The record does not support Viso's claim and falls short of demonstrating an adequate transition plan.

While there were some concerns about the stepgrandmother's ability to permanently care for the children, DHS never effectively communicated these concerns to the stepgrandmother in an attempt to maintain the children in a stable relative placement. Moreover, there is no evidence to support some of the

concerns that DHS claims—and the dissents now repeat—warranted the surprise removal of the children from their stepgrandmother. For example, Hackman testified about their concerns that the stepgrandmother was allowing the children to be around or cared for by "inappropriate people," specifically discussing a daughter-in-law who had pending criminal charges and a no-contact order with her own children.

Likewise, the dissents rely on the juvenile court's observation that the stepgrandmother allowed the children to spend time, including overnight visits, at their paternal grandmother's home despite concerns about the children's father living there. But nothing indicates DHS ever discussed this concern with the stepgrandmother, and Hackman conceded at the hearing that DHS had only "suspicions but no evidence" that the stepgrandmother was actually allowing inappropriate people around the children. *See In re X.O.*, 16–0313, 2016 WL 2743445, at *5 (Iowa Ct. App. May 11, 2016) (concluding the foster care social worker acted unreasonably in the posttermination phase of the proceedings by making unsupported representations to the adoption team). In fact, Hackman testified that she did not even know these overnight visits were occurring until the time of the hearing.

After the juvenile court entered the TPR order and just a few months before the removal at issue, the juvenile court—based in part on DHS reports—declared in terminating the parents' rights that "[the children] have had consistency in their relationship with [the stepgrandmother.] [The stepgrandmother] continues to provide for the children's needs. The children are safe with [the

stepgrandmother]." While the TPR order noted K.J.D. "has not been attending therapy consistently, which needs to be corrected," there was no mention of any attendance issues for K.T.D. in attending therapy. On the contrary, the TPR order reported K.T.D. was "making progress in therapy."

DHS's TPR report noted DHS had approved the stepgrandmother for adoptive placement. It is troubling that most of the concerns DHS now cites in defending its removal of the children from the stepgrandmother existed when it wrote its TPR report and the juvenile court issued its TPR order. In spite of these apparent concerns, DHS continued to approve the stepgrandmother for placement at that point.

DHS also contributed to some of its stated concerns through its own failure to effectively communicate to the stepgrandmother, like the issue of the stepgrandmother not placing the children in school or daycare. In fact, it is unfair to heap all of the blame on the stepgrandmother for declining to place the children in school or daycare. The parents' rights were not terminated until April 2021, approximately three months before the removal of the children from the stepgrandmother. As the juvenile court explained, "All of the responsibility for the children's education during the open CINA did not rest on [the stepgrandmother]. The children's guardians were still their parents, and DHS was to oversee the children's wellbeing."

Iowa Code section 232.2(21)(*b*)(6) provides that "the rights and duties of a guardian with respect to a child" include the duty "[t]o make other decisions involving protection, *education,* and care and control of the child." (Emphasis

added.) Thus, K.J.D.'s parents and later DHS as her court-appointed guardian bore the legal responsibility for K.J.D.'s lack of school enrollment, not the stepgrandmother. In any event, DHS removed the children from the stepgrandmother's care in July—a time period when the children presumably would not have been in school due to summer break. Moreover, we fail to see an issue with the stepgrandmother's decision not to send K.T.D. to daycare. We should not fault any caregiver who chooses and is able to stay home with a child instead of sending the child to daycare.

The dissents' emphasis on the stepgrandmother's lack of credibility is misplaced because she was not the one acting as the children's legal guardian. DHS—not the stepgrandmother—is the party with credibility on the line. The reasons the stepgrandmother offered at the hearing to explain why K.J.D. was not enrolled in school may be helpful in determining custody, but this appeal is focused on the role of guardian. At the time of removal from her care, the stepgrandmother was not the legal guardian with the rights or duties to make educational decisions for the children. *See* Iowa Code § 232.2(21)(*b*)(6). Those rights and duties fell to DHS as the legal guardian once the juvenile court terminated the parents' rights and any failure in fulfilling those rights and duties accordingly rests with DHS.

The fact of the matter is that DHS had oversight of the children's wellbeing from the time they were removed from their parents by court order in February 2020 and through the termination of the parents' rights in April 2021 and the September hearing in this case. Despite expecting the stepgrandmother to assist

the children with weekly therapy appointments, DHS had only facilitated a total of three sessions with one of the children's therapists in the two months following the children's removal from the stepgrandmother. If the stepgrandmother failed to meet the children's needs because she did not assist them with weekly sessions then the same is true for DHS when it failed to meet at least one of the children's therapy needs.

Instead of attempting to address its concerns with the stepgrandmother in a way that perhaps could have preserved the children's relative placement, DHS largely ignored them until a foster home became available that could take the children at least temporarily. The children had been in the stepgrandmother's care since January 23, 2020, and the juvenile court recognized this placement when it officially authorized the children's removal from their parents a few weeks later on February 6. In the almost eighteen months that the children were in their stepgrandmother's care before DHS removed them, the juvenile court conducted at least six hearings concerning the children where only minor issues, if any, were raised about the stepgrandmother's caretaking abilities.

Even in the juvenile court's "permanency review by paper filing only" in the month before the removal at issue, the juvenile court found, "The children's needs are being met. They are currently residing with [their stepgrandmother], suitable other placement." It is telling that DHS did not cite any apparent new concerns that arose within the next month that would warrant the immediate removal of the children from their stepgrandmother's home.

As the GAL aptly maintains, "DHS's erroneous action is even more egregious when viewed under the lens of the changing juvenile landscape with the onset of the Family First Prevention Services Act [FFPSA]," which created opportunities for states to receive federal funding for services that support and preserve family connections. Bipartisan Budget Act of 2018, Pub. L. No. 115–123, §§ 50701–50782, 132 Stat. 64, 232–268; *see also* Iowa Dep't of Hum. Servs., *Family First: Overview* (2022) https://dhs.iowa.gov/Child-Welfare/FamilyFirst [https://perma.cc/5T5F-VXTM] (explaining that FFPSA prioritizes the placement of children removed from their parents in this order: relative or fictive kin, licensed foster family, congregate care). We recognize that our current statute does not mandate a preference for relative placement after the termination of parental rights. *See In re N.V.*, 877 N.W.2d at 150. But it is troubling that DHS took virtually no effort to maintain the children's relative placement or attempt to determine another relative placement given FFPSA's emphasis on improving outcomes for children removed from their home by prioritizing relative or fictive kin placements.

All things considered, the process DHS used and the actions it took in reaching its decision to remove the children from their stepgrandmother by surprise and place them with strangers in foster care was unreasonable and irresponsibly undertaken. Nevertheless, we still must consider whether those actions served the children's best interests. *See id.* In analyzing the children's best interests, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to

the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2).

The State largely relies on events that occurred *after* the children were moved to foster care by discussing the progress the children have made in school and therapy. By all means, the juvenile court was free to consider the events that transpired after DHS removed the children from the stepgrandmother in deciding whether to remove DHS as the children's guardian. We simply do not believe these postremoval events carry much weight in this case because there was still no sense of permanency in the children's new placement.

In other appellate cases reviewing an action to remove DHS as guardian, the events that transpired after a party files a motion to remove DHS as guardian may be more relevant. For example, in *In re I.P.*, DHS removed the child from unrelated foster parents so that the child could be adopted by the same parents who adopted the child's half sister. 2019 WL 3317922, at *3–4. While the foster parents' motion to intervene and to remove DHS was still pending, DHS completed a home study for the half sister's adoptive parents and the study recommended transitioning the child into their home as a preadoptive placement. *Id.* at *2. The foster parents filed their motion to intervene in August 2018, but the juvenile court's hearing did not conclude until January 2019. *Id.* In that situation, around five months had passed between the motions and the hearing on them and there were no doubts that—if the juvenile court maintained DHS as guardian—the child would be placed in an adoptive home with his half

sister. *Id.* Those are definitely facts to consider in determining whether DHS acted reasonably and in the child's best interests.

In contrast, this case involves a hearing that occurred less than two months after the children were removed from their stepgrandmother and placed in a foster home with no real permanency plan in place. DHS had never placed children in the care of the foster parents whom it entrusted the girls to, and DHS adoption worker Viso testified that she had not asked the children's foster parents about the possibility of adopting the children before removing them from the stepgrandmother's home. Nor did DHS ask the foster parents how familiar they were with the children's mental health diagnoses or the therapy the children required.

This approach directly contradicts the children's best interests because it ignores the advice of the children's therapists despite DHS's contention that a primary reason for removing the children from their stepgrandmother was due to the stepgrandmother's failure to meet the children's therapeutic needs. K.T.D.'s therapist in particular stressed in reports that she needs a parent who understands her mental health needs and is "open to a therapeutic parenting approach" and "working closely with [the] therapist regarding the impact of [K.T.D.'s] developmental trauma." There is no evidence that DHS honored or even considered these recommendations. Any stability the children might have felt or progress they might have made in their foster home upon removal from the stepgrandmother may be little more than a brief honeymoon period because they remain susceptible to being moved again to yet another placement.

Children seeking adoptive homes face an increased risk of disruption, which occurs "after the child is placed in an adoptive home and before the adoption is legally finalized, resulting in the child's return to (or entry into) foster care or placement with new adoptive parents." Krysten E. Beech, *The Perfect Storm: When Failing Adoptions Collide with an Ineffective Legal System, Re-Homing Emerges as a Viable Option for Adoptive Parents—Suggestions for Fixing a Broken System*, 46 U. Tol. L. Rev. 449, 451 (2015) (quoting Child Welfare Info. Gateway, *Adoption Disruption and Dissolution* 1 (2012)). This risk increases "when [the] children . . . have emotional and/or behavioral issues" and "when agencies provide inadequate information regarding the child or the child's history" or "inadequate preparation, training, and support for [potential] adoptive parents." *Id.* Here, DHS moved children with mental health concerns from their home of eighteen months where they were surrounded by family only to place them in the home of strangers who had not been asked about their familiarity with the children's mental health diagnoses and no assurance that the foster home would become the children's permanent home. This created yet another possibility of disruption in the children's already unstable lives. Altogether, DHS failed to serve the children's best interests in acting as their guardian.

"As tempting as it is to resolve this highly emotional issue with one's heart, we do not have the unbridled discretion of a Solomon. Ours is a system of law . . . ." *In re B.G.C.*, 496 N.W.2d 239, 241 (Iowa 1992) (en banc). In this case, DHS did not meet its legal obligations as the children's guardian to "make every effort to establish a stable placement for the child[ren] by adoption or other permanent

placement." Iowa Code § 232.117(6). It also disregarded its own transition planning procedures. In summary, DHS violated two statutory obligations—the obligation to send relative notices and the obligation to "make every effort to establish a stable placement for the child[ren]"—and at least two of its own transition planning procedures. *Id.* §§ 232.84, 117(6). Accordingly, we hold the juvenile court abused its discretion when it declined to remove DHS as the children's guardian based on an erroneous application of the law.

DHS failed to act in the children's best interests because it directly harmed the children and only added to their trauma when it uprooted them from their stepgrandmother's home by surprise and placed them with foster parents who were seemingly unaware of the children's mental health issues or therapeutic needs. It also disregarded the advice from the children's therapists about their mental health needs through its actions in this case. Even Justice Mansfield's dissent acknowledges that "DHS behaved badly and probably *deserves* to lose its status as guardian." If an agency's failure to abide by the law and its own procedures is not enough to warrant its removal as the children's guardian, then it is difficult to imagine what meets the dissents' high burden for removal.

Ironically, one of DHS's primary reasons for removing the children from their stepgrandmother was DHS's belief that the stepgrandmother was not providing for the children's mental health needs. Despite the therapists' warnings against additional placements and assertions about the children's need for stability, DHS did not so much as discuss the possibility of the receiving foster parents' interest in adopting the children before making the sudden

change to the children's placement. The need for a permanent home is one of "the defining elements in a child's best interests," and DHS failed to act accordingly in this case. *In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially). Essentially, when it comes to the needs of the children, DHS took the "do as we say, not as we do" approach. It is unfortunate that the dissents do not hold DHS to the same standard that it expected the stepgrandmother to meet.

With that said, we do not treat this removal as a custody battle between DHS and the stepgrandmother as competing possible guardians. The children have been out of their stepgrandmother's care for almost a year, and the appellate record does not indicate whether their current foster home is willing to adopt the children or inform us of what has transpired since DHS presumably sent relative notices. It would certainly not be in the children's best interests for us to simply order that the juvenile court appoint the stepgrandmother as guardian when we have no information about what has transpired in the past year since this appeal commenced. Such an important decision demands a thorough consideration of the situation as it exists today, not as it existed when this appeal started.

Therefore, we reverse and remand for the juvenile court to remove DHS as guardian and appoint a suitable new guardian upon assessing the children's best interests. The dissents' focus on whether there is a suitable candidate for guardian other than the stepgrandmother overlooks the existence of at least one capable legal guardian for the children in the GAL, who has been involved in

these children's lives since their first removal in 2018. *See* Iowa Code § 232.117(3)(*c*) (authorizing the juvenile court to transfer guardianship to any "other suitable person"). Overall, we trust that the juvenile court will assess the available guardians and choose wisely.

Finally, we close with a reminder to the juvenile court and DHS that DHS is still required to "obtain a judicial determination that it has made reasonable efforts to finalize the permanency plan that is in effect" "at least once every twelve months thereafter while the child[ren] [are] in foster care" to receive federal funding for the children. *See* 45 C.F.R. § 1356.21(b)(2)(i) (2020). Although no longer guardian, DHS's obligations as an agency to these children who have not yet achieved permanency remain by statute.

**IV. Conclusion.**

For the foregoing reasons, we vacate the decision of the court of appeals, reverse the juvenile court's order, and remand for further proceedings consistent with this opinion.

**DECISION OF COURT OF APPEALS VACATED; JUVENILE COURT JUDGMENT REVERSED AND REMANDED.**

Appel, Waterman, and Oxley, JJ., join this opinion. Mansfield, J., files a dissenting opinion, in which McDonald and McDermott, JJ., join. McDonald, J., files a dissenting opinion, in which Mansfield and McDermott, JJ, join.

**MANSFIELD, Justice (dissenting).**

I respectfully dissent. The majority opinion does a very good job of showing that the Department of Human Services (DHS) bungled the July 26, 2021 removal of K.J.D. and K.T.D. from their stepgrandmother. It does a less good job of following the statute, Iowa Code section 232.118(1) (2021). It does an even less good job of giving appropriate deference to the fact-findings made by the experienced juvenile judge who heard this case.

Because I agree with the juvenile court and the court of appeals that it was not in the best interests of K.J.D. and K.T.D. at the time of the hearing to remove DHS as guardian and substitute the stepgrandmother or another relative, I would affirm.

**I. The Juvenile Court Properly Made the Best Interests Determination as of the Time of the Hearing.**

Iowa Code 232.118(1) provides,

> Upon application of an interested party or upon the court's own motion, the court having jurisdiction of the child may, after notice to the parties and a hearing, remove a court-appointed guardian and appoint a guardian in accordance with the provisions of section 232.117, subsection 3.

This section offers no *substantive* guidance for the juvenile court, but *procedurally* it clearly contemplates a hearing, after which the juvenile court may simultaneously remove the existing guardian and appoint another guardian.

On the subject of substantive standards, the court of appeals has observed, "The statute also does not set forth criteria for removal of a guardian. In the absence of statutory criteria, this court has examined the reasonableness

of the current guardian's actions and the best interests of the child." *In re N.V.*, 877 N.W.2d 146, 150 (Iowa Ct. App. 2016) (citation omitted). This is a logical approach, and the majority endorses it on paper but doesn't follow it in reality.

Best interests of the child should be decided at the time of the hearing. *See In re Marriage of Dawkins*, 285 N.W.2d 8, 9 (Iowa 1979) ("Some question was raised in this case whether the court must confine itself to circumstances existing at the time the petition for modification was filed or whether it could consider all facts up to the time of hearing. We believe the latter is the correct view, and we now adopt it as the rule in such cases."); *In re D.M.J.*, 780 N.W.2d 243, 245 (Iowa Ct. App. 2010) (explaining that grounds for termination must exist at the time of termination, not when the petition was filed).

However, the majority focuses not on the children's best interests *at the time of* the section 232.118 hearing, which is the relevant inquiry, but instead on whether the specific act of removal of the children from the stepgrandmother served their best interests at that moment. This collapses the two factors—reasonableness of DHS's actions and best interests of the children—into one. I disagree with what the majority has done. We should be looking at the overall best interests of the children as of the guardianship hearing, which is exactly what the juvenile court did here.

The majority's approach also leads it into a curious remand order. The guardian ad litem and the stepgrandmother sought an order removing DHS as guardian *and making the stepgrandmother guardian.* But the majority gives them only a half a loaf. It orders DHS removed while not deciding who should replace

DHS. Instead, it directs the juvenile court, on remand, to appoint anyone but DHS. This isn't contemplated by the statute, which couples removal of an existing guardian with appointment of a new one. The two decisions ought to be made together. How can you assess the best interests of the children in a guardianship situation without knowing who the new guardian might be? Instead, my colleagues force the juvenile court to immediately choose a private guardian who will have custody and control of the children, regardless of whether there exists a suitable candidate to be such a guardian.

**II. The Juvenile Court Made Thorough and Careful Fact-Findings Which Should Be Given Deference.**

In concluding that the best interests of the children did not warrant a change of guardianship, the juvenile court found that the stepgrandmother's "care was lacking in terms of the children's mental health care, her judgment in setting and maintaining boundaries, and providing for educational and developmental services and stability."[6]

These findings, to which we owe deference, are supported by the record. *See In re Z.K.*, 973 N.W.2d 27, 32 (Iowa 2022) ("We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." (quoting *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010))).[7]

---

[6]The juvenile court added that "[i]t is also not in the children's best interest for the court to place the children in the guardianship of an adult relative yet to be identified." Its order noted specific concerns with other adult relatives with whom the children had been spending time.

[7]The juvenile court made a specific credibility finding adverse to the stepgrandmother, namely, that her "motivation . . . seems to be [to] gain custody of the children regardless of whether she must be deceptive to do so."

The juvenile court order is impressive in the care and detail with which it was written. Let me try to summarize a few points.

Both children had a large number of missed or canceled therapy appointments. This occurred even though the appointments were being held virtually; all the stepgrandmother had to do was to log in. The stepgrandmother claimed that after she became aware that it was a "problem" for the children to miss therapy, the only sessions the children missed were due to "technical difficulties with the equipment." The technical difficulties excuse seems implausible given the large number of missed appointments. It also begs the question why the stepgrandmother, who had a background as a nurse, would have thought it was acceptable for the children to miss so much therapy in the first place.[8]

K.J.D. missed eleven out of twenty-four appointments. The stepgrandmother acknowledged she "didn't see eye to eye sometimes" with K.J.D.'s therapist. K.J.D.'s therapist reported that following the removal of K.J.D. to a foster family the appointments were able to occur in person.

K.T.D.'s therapist also reported multiple missed appointments while the children were with the stepgrandmother. She noted,

> Since entering foster care [K.T.D.] has been able to attend in person therapy. This had not been an option previously due to her grandmother's mobility concerns. [K.T.D.] has done well in person and has been more open and engaged in person. A consistent theme has emerged in [K.T.D.]'s play as well. [K.T.D.] has created multiple narratives where her grandmother is "always in bed" due to her bad

---

[8]The stepgrandmother testified she is no longer employed and receives disability payments.

foot. . . . It should be noted that it was the observation of this therapist that each time a telehealth session began or ended Grandma was in her bed and [K.T.D.] came to her for assistance.

As for maintaining boundaries, the juvenile court pointed out that the stepgrandmother allowed the daughters of her daughter-in-law to stay with her, K.J.D., and K.T.D. after the daughter-in-law had been charged with child endangerment and drug related charges and a no-contact order had been entered. Their stay wasn't disclosed to DHS, even though the criminal case began because the two daughters had been found smoking marijuana.

The juvenile court also observed that the stepgrandmother allowed K.J.D. and K.T.D. to spend considerable time, including overnight visits, at their paternal grandmother's home during the spring and summer of 2021. These visits occurred even though the children's father was living there, had unresolved domestic violence and drug issues, and had an outstanding warrant for his arrest. The DHS worker testified she didn't know that these visits were occurring until the time of the guardianship hearing. The stepgrandmother testified otherwise, but the juvenile court found her testimony not credible.

Lastly, regarding school, it is undisputed that the stepgrandmother had not enrolled K.J.D. in any kind of school for the 2020–2021 school year, even virtual school, although she had turned five before the beginning of the year. The stepgrandmother testified that K.J.D. "was behind academically, and socially, she wasn't ready for that." The juvenile court acknowledged that DHS had some responsibility for this situation, but it rightly noted that the stepgrandmother's testimony "sheds light on [her] approach to parenting the children." As the

juvenile court put it, "[I]f [K.J.D.] seemed academically and socially delayed a structured educational setting is what she needed."

The juvenile court concluded,

> It is not in the children's best interest to place them in the guardianship and custody of [the stepgrandmother]. [The stepgrandmother] has not shown that she is in the best position to act as the children's decisionmaker or person vested with meeting their permanency needs. Despite eighteen months of placement with [the stepgrandmother] with the supervision and support of DHS, in-home workers, and juvenile court, deficits in [the stepgrandmother]'s ability to meet the children's needs for consistency, stability, and mental health care persisted. There were shortfalls in her judgment as caregiver. [The stepgrandmother] continues to be dependent on other family members to care for the children. Every parent or grandparent who cares for children full time needs help—often. The problem here is that the people [the stepgrandmother] relies upon have their own deficits in safety, judgment, and setting boundaries. Further, [the stepgrandmother] doesn't just rely on these individuals, . . . she depends on them.

DHS behaved badly and probably *deserves* to lose its status as guardian. But "[j]uvenile law is not a fault-based edifice like tort law." *In re A.B.*, 956 N.W.2d 162, 169 (Iowa 2021) (quoting *In re Z.P.*, 948 N.W.2d 518, 523 (Iowa 2020)). Because we must consider what is best for the children, and afford proper deference to the juvenile court that oversaw this case from start to finish, I would affirm.

McDonald and McDermott, JJ., join this dissent.

**McDONALD, Justice (dissenting).**

Under an abuse of discretion standard, this court must affirm the district court's discretionary ruling absent a firm and definite conviction the ruling is " 'beyond the pale of reasonable justification under the circumstances' presented—a decision so flawed and prejudicial to the administration of justice that this court must provide relief." *See In re 2018 Grand Jury of Dallas Cnty.*, 939 N.W.2d 50, 66–67 (Iowa 2020) (McDonald, J., concurring in part and dissenting in part) (quoting *Harman v. Apfel*, 211 F.3d 1172, 1175 (9th Cir. 2000)). Stated differently, this court must affirm a discretionary ruling unless the district court "exercised its discretion on 'grounds or for reasons clearly untenable or to an extent clearly unreasonable.' " *In re J.A.L.*, 694 N.W.2d 748, 751 (Iowa 2005) (quoting *State v. Maghee*, 573 N.W.2d 1, 5 (Iowa 1997)). The appellants have not established the district court's decision to deny their motion to remove the Iowa Department of Human Services (department) as guardian for these children was beyond the pale of reasonable justification or for reasons clearly untenable. Therefore, I respectfully dissent.

Because we are an appellate court rather than part of the executive branch, it is not our role to dictate how the department should be managed. Taking on that role would be both unfair and unjudicial. The department frequently is faced with difficult circumstances and frequently is forced to pick the least-bad alternative in trying to do what is in the best interest of the children under its supervision. It is not the judicial branch's function to micromanage the

department's conduct as guardian in navigating these fraught and difficult situations. Courts are not empowered to replace a guardian because of mere disagreement with the guardian's placement decision. *See In re J.H.*, No. 20–0081, 2020 WL 2988758, at *8 (Iowa Ct. App. June 3, 2020) (Ahlers, J., specially concurring); *In re T.J.M.*, No. 18–1390, 2018 WL 5840806, at *5 (Iowa Ct. App. Nov. 7, 2018) (stating a court's mere disagreement with the department's placement decisions is not a basis for removal of the department as guardian). Instead, courts should intervene only where the department as guardian has so failed in the discharge of its duties that a new guardian must be appointed. *See In re J.H.*, 2020 WL 2988758, at *9–11. The proper judicial role in these cases is to afford the guardian discretion to act within the wide parameters established by law.

On a fair evaluation of the evidence, the appellants failed to show the department acted outside the parameters of its discretion as established by law and so failed in the discharge of its duties that a new guardian should have been appointed. On the contrary, a fair evaluation of the evidence shows the department acted in the best interest of the children in a difficult situation. Rather than rehashing all of the evidence here, I simply quote the conclusion from the more balanced decision of the court of appeals:

> Still, we reach the same conclusion as the juvenile court—the DHS was acting in the children's best interests by placing priority on the children's mental health and educational needs when searching for a permanent placement. The record does not support the assertion by White and [C.H.] that by removing the girls from their grandmother's care, the DHS has cut[] off their ties to extended family. In fact, [C.H.] has had visitation since their removal. In sum, the unreasonable actions by the DHS did not undermine its core

mission of "looking out for [the children's] best interests." *See* [*In re E.G.*, 745 N.W.2d 741, 744 (Iowa Ct. App. 2007)]; *see also In re R.S.*, No. 15–1244, 2015 WL 5578273, at \*2 (Iowa Ct. App. Sept. 23, 2015) (finding DHS action was "reasonable, responsible, and in the child's best interests" despite trauma caused by removal of child from foster family, with whom the child had bonded).

> . . . .

> Despite concluding that the DHS acted unreasonably at times, we must consider the overall best interests of the children. At the time of the hearing, the children had been with the new foster family for about a month. The children's therapists reported their consistent attendance and noted that they could hold sessions in person, something that was impossible when the children lived with [C.H.], who lived farther away and had her own mobility issues. Hasley reported [K.T.D.] was happy to be attending daycare, and she hoped it would promote more positive social-emotional development. Helleso reported [K.J.D.] felt secure and connected to her current living arrangement. She was enrolled in kindergarten and enjoying it. Viso testified the girls were "thriving." The record offers no information that a different placement would be better for their short- or long-term nurturing and growth. It may be true, as White and [C.H.] point out, that no other relative placements have been identified because the DHS did not send the notices during the CINA case. But the existing record shows no other permanent placement options. So it is in the girls' best interests for the DHS to remain as guardian and custodian.

(Fourth alteration in original.)

In my view, the juvenile court correctly denied the application to remove the department as guardian. More important, for the purposes of the actual issue presented in this case, I cannot conclude the district court's decision to deny the application to remove the department as guardian constituted an abuse of discretion. Eleven judges, including the district court, have looked at the application to remove the department as guardian for these children. Six of the eleven judges (the district court, two judges on the court of appeals, and the three dissenters here) that have looked at the file have concluded the department

should not be removed as the guardian of these children. I am hard-pressed to conclude the district court's decision to deny the application to remove the department as guardian was beyond the pale of reasonable justification or clearly untenable when a majority of judges that have looked at the file have concluded the department should not have been removed as the guardian for these children. I respectfully dissent.

Mansfield and McDermott, JJ., join this dissent.